UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARILYN RIVERS

                Plaintiff,                  **AMENDED COMPLAINT AND**
                                         **DEMAND FOR JURY TRIAL**
                                         **1:23-cv-818 (BKS/DJS)**

          -against-

CITY OF SARATOGA SPRINGS, NEW YORK;
MAYOR RON KIM, individually and in his official
capacity; and COMMISSIONER JAMES MONTAGNINO,
individually and in his official capacity,

                Defendants.

        Plaintiff, Marilyn Rivers, by and through her attorneys, Capezza Hill, LLP, hereby alleges

as her Amended Complaint the following:

<u>**PRELIMINARY STATEMENT**</u>

        1.     This is a claim for discriminatory hostile work environment, retaliation, and

defamation perpetrated against Plaintiff Marilyn Rivers, a career civil servant whose stellar

reputation and good name were repeatedly maligned by Defendants, who saw fit to play political

football with her reputation and career in the furtherance of their small political aims and self-

aggrandizement.  Because of Defendants' unlawful, discriminatory, and hostile conduct including

patently false public statements questioning Marilyn Rivers' integrity and accusing her of illegal

and unlawful conduct, she was forced to prematurely retire from a position she held without

blemish for over twenty (20) years – a position in which she thrived, and which benefitted the City

of Saratoga Springs.

<u>**PARTIES**</u>

        2.     That Plaintiff Marilyn Rivers is an individual residing in the Town of Queensbury,

County of Warren, State of New York. Marilyn Rivers is over forty years of age.

3.      That at all times relevant herein, defendant City of Saratoga Springs, New York (hereinafter "City"), is a municipal corporation organized and existing pursuant to the laws of the State of New York.

4.      That at all times relevant herein, defendant Ron Kim is the duly elected Mayor in the City of Saratoga Springs and is a resident of the County of Saratoga, State of New York.

5.      That at all times relevant herein, defendant James Montagnino is the duly elected Commissioner of Public Safety for the City of Saratoga Springs and is a resident of the County of Saratoga, State of New York.

6.      Both Defendants Kim and Montagnino serve as City Council Members and regularly participate in public City Council meetings.

## JURISDICTION AND VENUE

7.      This action is brought under the New York State Human Rights Law, New York State common law, and under 42 U.S.C. § 1983.

8.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over her state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this court pursuant to 28 U.S.C. § 1391 because all parties reside within the Northern District of New York and a substantial part of the events giving rise to the claim occurred within the Northern District of New York.

10.      A Notice of Claim pursuant to the New York State General Municipal Law was served on the City of Saratoga Springs Corporate Counsel on September 27, 2022.

11.      Defendant City did not exercise its right to a Gen. Mun. L. 50-h hearing.

12.    More than thirty (30) days have elapsed since the presentation of the claim and the claim remains unpaid and unadjusted.

## FACTUAL ALLEGATIONS

13.    Plaintiff is a public servant who sat for a public service exam and was hired by the City on or about April 7, 2003.

14.    Since that time, she has served as the City's Risk and Safety Manager and the Director of Risk and Safety pursuant to the duties bestowed upon her by the Civil Service Commission of the City.

15.    Defendant Ron Kim was elected Mayor of the City on or about November 3, 2021, and took office on or about January 1, 2022.

16.    The City of Saratoga Springs is a commission form of government.

17.    In her role as Director of Risk and Safety, Mrs. Rivers reported to the Commissioner of Accounts  Dillon Moran, the newly elected Commissioner of Accounts as of January 1, 2022.

18.    The Risk and Safety position and functionality was placed into the Department of Accounts in 2002 by a City Council action.

19.    From 2003 through 2023, Mrs. Rivers was given increased responsibilities in her role as the City's Risk and Safety Manager and subsequently was named the Director of Risk and Safety in recognition of those increased job responsibilities.

20.    For example, in or about March of 2014, the City Civil Service Commission outlined Mrs. Rivers' job duties as follows: "General direction is received from the Commissioner of Accounts with wide leeway allowed for independent judgment." Mrs. Rivers was given the responsibility of directly supervising clerical staff assigned to her as the Director of Risk and

Safety.

21.      Moreover, beginning in 2020, Mrs. Rivers was provided the authority via a memo executed by then Commissioner of Accounts John P. Franck to submit electronic vouchers and purchase orders to the Assistant Purchasing Agent without approval from the Commissioner of Accounts or Deputy Commissioner of Accounts.

22.      Ms. Rivers was also given authority by the Commissioner of Accounts in 2020 to execute documents on his behalf during the COVID pandemic and its emergency declarations when he was unavailable.

23.      Ms. Rivers acted in a managerial role for the City Clerk, Deputy Registrar, Purchasing, and Secretary to the City Council during time periods when the Deputy Commissioner was ill and/or not present. (This was well known throughout City governance and favorably accepted by staff.)

24.      The Civil Service Job Description for Director of Risk and Safety, adopted in 2014, noted that said position included "wide leeway for independent judgment."

25.      Mrs. Rivers' credentials include Chartered Property Casualty Underwriter ("CPCU") – a designation and credential widely recognized in the insurance industry that requires demonstrated proficiency in ethics and other risk management-related areas; Associate in Risk Management ("ARM") designation, another industry-recognized credential requiring coursework and examinations in order to demonstrate proficiency in ethics and risk management; and Associate in Claims ("AIC") designation, demonstrating proficiency in the assessment of claims liability and their handling in working with designated insurance counsel and insurance adjusters.

26.      On January 6, 2022, Plaintiff was called into a meeting with Defendant Mayor Ron Kim, Deputy Mayor Angela Rella, and Commissioner Dillon Moran to discuss the City's contracts

with legal counsel, the City's insurance policies and its legal counsel, and its use and management of the City's insurance program legal counsel.

27.    At the meeting, Defendant Mayor Ron Kim stated that the management of all of the City's insurance litigation, which had historically and previously been Mrs. Rivers' responsibility since her hire in 2003, would be transitioned to the City Attorney and Mayor's Office.

28.    In this meeting and others, Defendant Mayor Kim spoke dismissively to Mrs. Rivers, often questioning her specialized knowledge.

29.    Upon information and belief, Defendant Mayor Kim wanted more control over the City's litigation so that he could exert influence over politically charged cases, including the wrongful death case of the Estate of Darryl Mount versus the City of Saratoga Springs.

30.    Upon information and belief, Defendant Mayor Kim had meetings and communications with a private attorney representing the Estate of Darryl Mount, who was seeking a favorable settlement with the City.

31.    Mrs. Rivers did not know about these meetings, nor, upon information and belief, did the City's insurance carrier or assigned insurance defense legal counsel.

32.    On January 27, 2022 Commissioner Moran requested Mrs. Rivers provide copies of the City's insurance policies to Defendant Commissioner of Public Safety James Montagnino and his Deputy Commissioner Jason Tetu. On that same date, Deputy Mayor Angela Rella requested a "copy of the City's malpractice insurance that would cover the Mayor's City Attorney appointment." Mrs. Rivers provided copies of the City's insurance program to both parties and other members of the City Council per the permission she received from Commissioner Moran.

33.    On March 8, 2022, Mrs. Rivers had a private meeting with City Attorney Tony Izzo

at which she expressed her concern that Commissioner Moran had directly contacted the City's insurance carrier regarding litigation involving a former City employee, Timothy Wales.

34.    Mrs. Rivers informed Mr. Izzo that Commissioner Moran claimed he had testimony that would materially affect the case. Commissioner Moran's name had been brought forward by the Wales attorney during prior depositions involving the Wales case as the individual who would settle the case once the election was over and he took office.

35.    Mrs. Rivers expressed the concern that Commissioner Moran should not participate in the discussions as a potential material witness and expressed fear of retaliation and charges of insubordination if she spoke of the matter to Commissioner Moran.

36.    City Attorney Izzo reminded Mrs. Rivers that she reported directly to Commissioner Moran and that she must follow his directives.

37.    On March 21, 2022, City Attorney Izzo requested a "quick" meeting with Mrs. Rivers at which he informed Mrs. Rivers that, at the behest of Mayor Kim, he was investigating her for her alleged improper attendance at depositions as a representative of the City in various prior cases against the City.

38.    Izzo said the Mayor, who is a lawyer, was accusing Mrs. Rivers of "acting as a lawyer" during the proceedings in question.

39.    Upon information and belief, Defendant Mayor Kim made this false accusation to many individuals within and without the City government.

40.    Mrs. Rivers has never "acted as an attorney" and tried to explain her responsibilities and practices as the Director of Risk and Safety and as the City's Authorized Insurance Representative working with insurance carrier claims managers and assigned legal counsel throughout her nineteen (19) year tenure per the responsibilities assigned to her by the previous

Commissioners of Accounts, City Attorneys, City Councils, and her professional credentials.

41.     When Mrs. Rivers reached out to Commissioner Moran during this meeting, Commissioner Moran directed her to cooperate with Mr. Izzo.

42.     On May 10, 2022, Commissioner Moran informed Plaintiff that Defendant Mayor Kim was intending to set her up to be fired.  Mrs. Rivers expressed concern that she was being targeted. Commissioner Moran sent an email to Mrs. Rivers for a spreadsheet of all "Pending, Ongoing Legal Matters" that "delineates all of the Legal matters currently underway, or anticipated to be underway" which she provided as requested to Commissioner Moran, Mayor Kim, Deputy Mayor Angela Rella, Deputy Commissioner Stacy Connors and City Attorney Izzo.

43.     On May 16, 2022, Mrs. Rivers became aware of a City Council Resolution offered by Defendant Mayor Ron Kim on the City Council Pre-agenda titled "Discussion and Vote: Resolution – Title 8 (Legal Matters)."

44.     However, on May 16, 2022, no copy of the Resolution in question was attached to the agenda. Commissioner Moran again repeatedly informed Mrs. Rivers that "the City Council members were out to get her."

45.     On May 17, 2022, Mayor Kim once again listed a City Agenda Item titled "Discussion and Vote: Resolution – Title 8 (Legal Matters)."

46.     The Resolution resolved that the City Attorney shall ". . . Consistent with the preservation of the attorney/client privilege, coordinate all consultations with outside legal counsel retained by the City, or assigned on behalf of the City by an entity providing insurance coverage to the City."

47.     The proposed Resolution identified Mrs. Rivers as the City's Risk and Safety Manager and not her current title, precipitating Mrs. Rivers' anxiety that she was either being

demoted or fired. At no time before, during, or after the City Council Meeting in question was Mrs. Rivers approached to discuss or explain what the Resolution meant for her employment. The only communication she received was a verbal comment from Commissioner Moran that "the City Council members were out to get her."

48.    This resolution effectively sought to remove and materially change the duties assigned to Mrs. Rivers in her Civil Service job description and place them under the power and control of Defendant Mayor Kim through his appointed City Attorney.

49.    In a May 18, 2022 email to the City's insurance agent, Matt D'Abate at Amsure Insurance Company, Defendant Mayor Kim accused Mrs. Rivers of illegally practicing law as a non-lawyer without supervision – a criminal act – and asserted that the City needed to "protect" itself from Mrs. Rivers.

50.    Upon information and belief, Defendant Mayor Kim made this false accusation against Mrs. Rivers to many others inside and outside of City government.

51.    Mr. D'Abate and Travelers insurance counsel Norah Murphy provided emails in response to the accusation explaining Mrs. Rivers' role as the City's Authorized Insurance Representative and an explanation of her credentials for her role.

52.    On May 24, 2022, a special City Council meeting was held to continue the proceedings of the May 17, 2022 City Council Meeting that was interrupted by a fire.

53.    The Mayor's Agenda Item No. 12: "Discussion and Vote: Resolution – Title 8 (Legal Matters)" was once again presented for Discussion and Vote.

54.    Commissioner Moran informed Mrs. Rivers that there were serious attempts being made by Defendant Mayor Kim and Defendant Commissioner Montagnino to fire her. A heated discussion ensued during this City Council meeting regarding the lack of due process and the

agenda item was voted down.

55.    On or about May 24, 2022,  Plaintiff Marilyn Rivers engaged in protected conduct when she filed a hostile work environment claim with Defendant's Human Resources Office, stating that Defendant Mayor Ron Kim and his staff created a discriminatory and hostile work environment through various efforts to undermine her authority and integrity, including through falsely accusing Mrs. Rivers of improperly "acting as an attorney," questioning her professionalism, and taking away her job duties and responsibilities.

56.    The hostile work environment Defendants created was motivated in substantial part by Mrs. Rivers' sex and age.

57.    Even though a discrimination complaint was filed, no investigation of Mrs. Rivers' claims occurred, contrary to City policy and custom.  Upon information and belief, Mayor Kim prevented and/or discouraged Human Resources from conducting any such investigation.

58.    On the June 6, 2022 City Council Pre-agenda, Defendant Mayor Kim introduced a resolution stating that "[t]he position of Risk and Safety Manager shall report to, and work under the general supervision and administrative direction of, the City Attorney, effective July 1, 2022."

59.    Commissioner Moran continued to inform Mrs. Rivers that Defendant Mayor Kim was intent on firing her and/or defunding her so he could control the City's litigation and influence the outcomes of cases with political import.

60.    Commissioner Moran demanded that Mrs. Rivers present herself to the City Council Meeting to defend herself and to "gather the troops" to come to defend her for the discussion.  Commissioner Moran additionally "gathered the troops" to be present in force at this meeting.

61.    On June 7, 2022, Mayor Kim listed the same agenda item for the June 7, 2022 City

Council Meeting Agenda titled "Discussion and Vote: Resolution: Risk & Safety in City Attorney's Office."

62.    At the meeting, Mayor Kim made allegations against Mrs. Rivers regarding the Wales case – specifically that Mrs. Rivers "attempted to resolve a legal matter without involving the city attorney's office, any member of the city council, or specific department that was the subject of the litigation." These statements were made in support of his motion to move her position under the supervision of the City Attorney which since 2022 has been part-time. Mrs. Rivers was given two (2) minutes to defend her actions and the entirety of the Risk and Safety Program practices for the past nineteen (19) years. The vote failed.

63.    Defendant Kim made the aforementioned defamatory statements even though a lawyer for the City's insurance company, Travelers, clearly explained in an email Kim received prior to the June 7, 2022 meeting that Mrs. Rivers never engaged in the practice of law, that she served an essential role in handling claims against the City, and that pursuant to the City's insurance policy with Travelers, the authority to settle the claim rests with the insurance company, not the City as its insured.

64.    Mrs. Rivers stated for the record during this meeting that City Attorney Izzo, Human Resource Administrator Spadaro, and hired legal counsel Brian Kremer had been copied on the settlement communications involving the Wales case by Mrs. Rivers and the insurance counsel.

65.    On or about July 18, 2022 Mrs. Rivers prepared a voucher for the $25,000 deductible owed to Travelers for invoice number 613195 pertaining to the Wales settlement in accordance with the City's Finance and Purchasing Policies and discussed the matter with Deputy Commissioner Connors as was the standard protocol.

66.     Deputy Commissioner Connors verbally approved the payment and Mrs. Rivers uploaded it into the City's voucher processing system for payment following the City's Standard practice. The voucher was reviewed, approved, and processed by City purchasing and finance staff and sent onward to the City Council Agenda for City Council approval on August 2, 2022. It was placed within the Consent Agenda as part of the regular warrant as was standard and historic protocol – a protocol controlled by the City's Finance Department.

67.     At no time between Mrs. Rivers' conversation with Deputy Commissioner Connors on July 18, 2022 and the City Council Meeting of August 2, 2022 was any question asked or concern expressed about the invoice payment with Mrs. Rivers.

68.     On or about July 19, 2022, Mayor Kim attempted to prevent Mrs. Rivers from performing yearly workplace violence, discrimination, and other trainings for City Hall employees. Mrs. Rivers historically conducted these trainings in past years and they are included in her job description.

69.     Through his human resources administrator, Mayor Kim cancelled Mrs. Rivers' scheduled training in a retaliatory attempt to wrest this responsibility from her office and bring it under his control.

70.     At the August 2, 2022 City Council meeting, Mayor Kim again engaged in retaliatory conduct when he accused Mrs. Rivers of purposely hiding from the City Council a $25,000 deductible payment related to the settlement of the Wales case.

71.     Mayor Kim stated Mrs. Rivers did not inform his office that a $25,000 deductible was owed to the City's insurance carrier, Travelers, and that any such agreement to settle the case should have been presented to and approved by the Council and blatantly suggested that because Mrs. Rivers did not properly present the approved settlement to the Council for approval, she had

deceptively hidden it from the Council and the public. Specifically, Mayor Kim stated that Mrs. Rivers deceptively "tried to hide" the settlement from the Council.

72.    The request for approval of the deductible payment was added to the regular warrant by finance department staff and placed on the "consent agenda" as had been done historically.

73.    Mayor Kim and all council members knew that the request for a $25,000 deductible payment would not have come from anyone other than Mrs. Rivers as the Director of Risk and Safety.

74.    Mrs. Rivers was repeatedly referenced by name and title as the person responsible for "hiding" the deductible during the August 2, 2022 City Council meeting.

75.    Mayor Kim's defamatory statements against Mrs. Rivers were false and he knew they were false at the time he made them.

76.    At the same meeting, Commissioner Minita Sanghvi alleged that Mrs. Rivers appeared to have decided for the entire City that the City Council should not know that the deductible was being paid using taxpayer money. Commissioner Sanghvi is fiduciarily responsible for reviewing and approving the proposed warrant before it is submitted to the City Council for approval. Had she reviewed the warrant she would have found the invoice in question and its attached documentation. If she had a concern, she and/or her staff were obligated to inform Mrs. Rivers of the concern and adjust the warrant as appropriate before it was uploaded to the City Council agenda for approval.  This too was known by Defendants Kim and Montagnino.

77.    Defendant Commissioner Montagnino accused Mrs. Rivers of a "reprehensible" action, "pulling a fast one," and hiding the Travelers deductible payment amongst payments for miscellaneous expenses including uniforms, auto parts, buckets, mops, brooms, and toilets.

78.    These statements were false and Defendant Montagnino knew they were false when he made them.

79.    Mayor Kim then asked for a "Discussion and Vote: Resolution – Risk & Safety" moving the Director of Risk and Safety to the Mayor's Office under the general supervision and administrative direction of the Mayor and Deputy Mayor effective August 22, 2022.

80.    The move of Mrs. Rivers' position under the umbrella of the Mayor's office was made as a retaliatory measure, intended to take away Mrs. Rivers' independence and authority as the Director of Risk and Safety and place it within the Mayor's control and purview through his appointed City Attorney.

81.    Commissioner Moran confirmed at the meeting, in real time, that Mayor Kim had a "personal animus and bias against" Mrs. Rivers.

82.    Mayor Kim's resolution passed with three (3) votes – Kim, Montagnino, and Sanghvi.

83.    No other director had their position moved under the Mayor's supervision.

84.    Mrs. Rivers' constitutional and civil service job rights were continually violated by the public airing of malicious and false accusations that she pretended to be a lawyer in legal proceedings and engaged in questionable unknown management of insurance claims and litigation.

85.    On August 3, 2022, Mrs. Rivers sent an email to Christy Spadaro, Human Resource Administrator, reaffirming and reiterating the continued hostile work environment perpetuated by Commissioner Minita Sanghvi, Commissioner James Montagnino and Mayor Ron Kim as exemplified in their false statements made at the August 2, 2022, City Council Meeting.

86.    On August 6th, 2022, during a Special City Council Meeting, Defendant Mayor Ron Kim, Defendant Commissioner James Montagnino, and Commissioner Dillon Moran continued to

make false accusations against Mrs. Rivers regarding the Wales case settlement and the $25,000 insurance deductible payment.

87.    Commissioner Dillon Moran accused City Council members of trying to "set up" Mrs. Rivers for termination.

88.    Commissioner Moran further stated that Defendant Commissioner Montagnino screamed at Deputy Commissioner Connors on three separate occasions on Friday, July 29, 2022, demanding Mrs. Rivers be fired in front of staff.

89.    On Friday, July 29th, 2022, Deputy Commissioner of Accounts Stacy Connors reported to Ms. Rivers, after meeting with Commissioner Montagnino and Mayor Kim, that both were calling her foul names and demanding that she be fired. She reported they were accusing her of not doing her due diligence in regards with respect to her handling of a competitive bid for the City's new fire station.

90.    Montagnino and Kim both knew that Connors would relay their statements to Mrs. Rivers. These accusations and verbal attacks were without basis, false, and intended to intimidate and demean Mrs. Rivers.

91.    These threats, verbal attacks, and other hostile acts were motivated by discriminatory animus based on Mrs. Rivers sex and age to undermine her strength and independence as an accomplished female public servant.

92.    At the August 6, 2022 meeting, Defendant Commissioner Montagnino further accused Mrs. Rivers of "tucking away" the deductible payment in question in the Consent Agenda.

93.    At the time they made these false statements and accusations, Defendants Mayor Kim and Montagnino knew that the City's insurance policy was a "non-consent" policy, meaning that Travelers can decide to settle a case without the City's consent.

94.    Indeed, in and on the record hearing before the Honorable Mae A. D'Agostino, United States District Court Judge for the Northern District of New York on August 11, 2022 in the Wales case, Mayor Ron Kim admitted that he understood the City's insurance policy through Travelers was a "non-consent" policy and, in so doing, laid bare that all of his prior public attacks against Plaintiff were false and, importantly, that he knew they were false when he made them.

95.    Moreover, at the time they accused Mrs. Rivers of "hiding" a settlement payment and failing to apprise the City Attorney of the settlement status, Defendants Mayor Kim and Commissioner Montagnino knew that Mrs. Rivers had previously informed the City Attorney's office about the settlement via multiple emails to City Attorney Izzo, Christy Spadaro, Human Resource Administrator and City Labor Counsel Brian Kremer.

96.    Defendants' public statements were made with malice and for the purpose of attempting to score cheap political points at the expense of a dedicated public servant and in retaliation for Mrs. Rivers' hostile work environment claim filed against Mayor Kim.

97.    The retaliatory move of Mrs. Rivers' position under the supervision of the Mayor's Department was intended to, and did in fact, limit Mrs. Rivers' independence, decrease her responsibilities, and undermine her authority by subordinating her.

98.    The Civil Service Commission formally adopted the transfer of the position of the Director of Risk and Safety from the Accounts Department to the Mayor's Office and upon the request of Mayor Kim, the term "general" was replaced with "direct" removing any independence Ms. Rivers had since her date of hire in 2003 with the duties granted by the Civil Service Commission at that time. Mayor Kim has installed each of the three current Civil Service Commissioners who voted for this change contrary to the resolution passed by City Council stipulating the supervision status of "general" remain.

99.    One significant example of this change in status was that Mrs. Rivers was instructed to copy Deputy Mayro Rella on every single email she sent, and to wait for Rella's permission to take actions on matters Mrs. Rivers previously had discretion over.

100.    Mrs. Rivers was prohibited from submitting vouchers for payment, even though that was previously within her responsibility.

101.    Mrs. Rivers' purchasing authority to  directly submit vouchers and requisition orders to the Assistant Purchasing Agent was also completely removed and placed in the hands of the Deputy Mayor.

102.    Likewise, Mrs. Rivers was excluded from communications with the City's Insurance Agent regarding claim payments.  Past practice and custom had been for the Mayor and/or council members to seek clarification of insurance issues directly from Mrs. Rivers, which changed upon her reassignment under the Mayor's office.

103.    Mayor Kim also prevented Mrs. Rivers from participating in the Safety Committee activities, which was previously one of her responsibilities, by discouraging fellow City Council members from sending staff from their departments to participate.

104.    Mayor Kim moved Mrs. Rivers' office to the City Attorney's Office, where she was forced to use an old conference table as a makeshift desk until she finally ordered herself a desk.

105.    Mayor Kim continued his discriminatory and retaliatory conduct by excluding Ms. Rivers from the decision-making process.  For example, Kim stated in his August 2, 2022 Resolution that the Risk and Safety Manual would be updated by September 20, 2022, but never tasked Ms. Rivers with re-writing it.  She took it upon herself to revise the Risk and Safety Manual as part of his "overhaul" of the City's risk management program.  Mrs. Rivers submitted a

proposed revised manual to Mayor Kim and Deputy Mayor Rella within his September 20, 2022 deadline, but thereafter received no comments despite repeated requests for feedback. Upon information and belief, the previous Risk and Safety manual adopted in 2021 is still in effect.

106.    Mrs. Rivers continued her employment with the City, notwithstanding the hostile work environment described above, in order to qualify for retirement health benefits that vested on or about April 7, 2023, after twenty (20) years of service.

107.    The City and Mayor Kim knew that Mrs. Rivers would not retire until reaching the vesting date as historically required by the City's non-union resolution.

108.    Mayor Kim and Montagnino did not defame or harass male civil servants of equal or similar rank and experience as Mrs. Rivers.

### AS AND FOR A FIRST CAUSE OF ACTION FOR DEFAMATION AGAINST DEFENDANTS KIM AND MONTAGNINO, PLAINTIFF ALLEGES AS FOLLOWS:

109.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108 above.

110.    That on numerous occasions between March 7th and August 31, 2022, Defendants did intentionally produce false statements purporting to be factual, which exposed Plaintiff to public ridicule, embarrassment, and more.

111.    That Defendants negligently, recklessly, and intentionally with malice published and/or communicated the false statement to the general public and third parties without permission or authorization of the Plaintiff.

112.    Specifically, Defendants accused Mrs. Rivers of unethical, illegal, criminal, and deceptive conduct at public City Council Meetings, in discussions with the City's insurance agent, and with many other members of the public.

113.    That as a consequence of Defendants' false and malicious statements, Plaintiff has

suffered harm to her reputation, standing in the community, and damage to her career and livelihood.

114.    That Defendants' false statements and accusations of deceptive, unethical, and criminal conduct through allegedly acting as an attorney and attempting to hide a deductible payment from taxpayers, exposed Plaintiff to public contempt and ridicule and therefore constitute defamation *per se*.

115.    As a consequence of Defendants acts, Plaintiff has suffered significant damages and reputational harm.

## AS AND FOR A SECOND CAUSE OF ACTION FOR STIGMA PLUS DUE PROCESS CLAIM UNDER 42 U.S.C. § 1983 AGAINST DEFENDANTS KIM AND MONTAGNINO, PLAINTIFF ALLEGES AS FOLLOWS:

116.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 115 above.

117.    At all times relevant, Plaintiff was a public employee of the City of Saratoga Springs.

118.    At all times relevant, Defendants Kim and Montagnino were acting in their capacity as public officials and state actors acting under color of law.

119.    That Plaintiff at all relevant times possessed a liberty interest in her good and well-earned reputation, honor, and integrity.

120.    That Defendants falsely charged Plaintiff with deceit, unethical, and criminal misconduct, which charges placed a stigma on her reputation.

121.    Defendants' statements are and can be proven false.

122.    That the false charges were made public by the City's agents, Defendants Kim and

Montagnino, in public statements as set forth above.

123. That the false and defamatory statements were made in connection with Plaintiff's employment, her constructive discharge, and caused her to lose job opportunities that would have otherwise been available to her.

124. By virtue of the foregoing, Defendants deprived Plaintiff of clearly established rights protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Plaintiff sustained the damages herein alleged.

## AS AND FOR A THIRD CAUSE OF ACTION FOR NYSHRL DISCRIMINATION BASED ON SEX AND AGE AND HOSTILE WORK ENVIRONMENT AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES AS FOLLOWS:

125. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 124 above.

126. At all times relevant herein, Plaintiff was an employee of Defendant City of Saratoga Springs within the meaning of the New York State Human Rights Law (N.Y. Exec. Law § 290).

127. At all times relevant herein, the City of Saratoga Springs is a covered employer pursuant to the NYSHRL.

128. By and through their course of conduct as alleged above, the individual Defendants, Kim and Montagnino, willfully violated the NYSHRL, by subjecting Plaintiff to a hostile work environment, discriminating against Plaintiff, denying her equal terms and conditions of employment, harassing Plaintiff, and materially altering the terms and conditions of her employment because of her gender, sex, and age.

129. Plaintiff was subjected to harassment by City of Saratoga Springs and its agents and employees, including Defendants Kim, and Montagnino, because of Plaintiff's sex and age.

130.    The City of Saratoga Springs' agents and employees' conduct was not welcomed by Plaintiff.

131.    This conduct occurred due to the fact that Plaintiff was a member of a protected class. The conduct was so severe and pervasive that a reasonable person would consider the work environment to be hostile, and Plaintiff was subjected to this conduct by these Defendants and she was harmed as a result of this conduct.

132.    Regardless of whether the conduct was severe or pervasive, the harassment rises above the level of petty slights or trivial inconveniences.

133.    Plaintiff considered the work environment to be hostile as a result of City of Saratoga Springs' agents and employees' conduct.

134.    As a consequence of Defendants' discriminatory actions, Plaintiff has suffered damages including but not limited to severe emotional distress and economic damages.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR RETALIATION UNDER THE NYSHRL AGAINST ALL DEFENDANTS, PLAINTIFF ALLEGES AS FOLLOWS:

135.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 134 above.

136.    By their conduct described herein, Defendants retaliated against Plaintiff for engaging in protected activity, in violation of the New York State Human Rights Law, New York Executive Law §§ 290, et seq.

137.    Plaintiff engaged in protected conduct when she filed an internal hostile work environment claim on or about May 24, 2022  and again on August 3, 2022 with human resources against defendant Mayor Ron Kim, and members of the City Council.

138.    As a result of her complaint, Defendants and Defendants' agents and employees

took materially adverse actions against Plaintiff, including but not limited to, preventing Plaintiff from performing trainings for City Hall employees, removing responsibilities and autonomy from her position, and accusing Plaintiff of illegal, criminal, deceptive and unethical conduct, and publishing false claims about Plaintiff.

139.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of pecuniary loss, irreparable damage to her reputation; psychological harm; present and future pain and suffering; mental anguish; anxiety; and loss of enjoyment of life.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR CONSTRUCTIVE DISCHARGE UNDER NYSHRL AGAINST DEFENDANT CITY OF SARATOGA SPRINGS, PLAINTIFF ALLEGES AS FOLLOWS:

140.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 139 above as though the same were set forth in full herein.

141.    Plaintiff was, at all times relevant herein, an employee of defendant City of Saratoga Springs.

142.    Through the course of conduct as alleged above, Plaintiff was subjected to multiple acts of discrimination, a continuous hostile work environment, defamatory statements, and retaliation against her.

143.    But for Defendants' discriminatory conduct and failure to protect Plaintiff from same, she would have continued working at the City of Saratoga Springs rather than being forced to apply for early retirement.

144.    Plaintiff was intentionally subjected to an objectively intolerable working environment that forced her to retire early involuntarily. Her premature retirement was a result of the culmination of a concerted effort on the part of Defendants to force her departure. Plaintiff,

along with any reasonable person, would have found the aforementioned acts to be so intolerable that they would feel compelled to retire early and leave employment with the City.

145.    As a direct and proximate result of the defendants' conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss of wages, loss of benefits, retirement benefits, irreparable damage to her reputation, severe emotional distress, loss of consortium, physical and mental health problems, which all have caused permanent economic injury to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment and compensatory and punitive damages against the defendants in an amount which exceeds the jurisdictional limit of all lower courts, a name-clearing hearing, an order awarding reasonable attorney's fees together with the costs and disbursements of this action, punitive damages, and for such other and further relief as the Court may deem just and proper.

Dated:  September 15, 2023

**CAPEZZA HILL, LLP**

By:    _____
BENJAMIN W. HILL, ESQ.
Attorneys for Plaintiff
30 South Pearl St. P-110
Albany, NY 12207
(518) 478-6065
ben@capezzahill.com